**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 98-41565
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANKLIN DE LA PENA-JUAREZ,
also known as Carlos Ottoniel De La Pena,

Defendant-Appellant.

_____

_____

No. 99-20479
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GAMALIEL AGUIRRE-TIBRA,

Defendant-Appellant.

Appeals from the United States District Court
For the Southern District of Texas

June 13, 2000

Before EMILIO M. GARZA, DEMOSS, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Franklin De La Pena-Juarez ("De La Pena-Juarez") appeals the district court's denial of his motion to dismiss his indictment based upon a violation of the Speedy Trial Act, 18 U.S.C. § 3161(b). Gamaliel Aguirre-Tibra ("Aguirre-Tibra") also seeks review of the district court's denial of his motion to dismiss his indictment based upon a Speedy Trial Action violation. Because these cases raise an identical issue of law, we consolidate them for the purposes of this opinion. For the reasons set out below, we affirm the judgments of the district courts.

I

A

De La Pena-Juarez, a citizen of Guatemala, was deported from the United States in 1994 after being convicted of a drug offense in a Florida state court. On June 29, 1998, the Immigration and Naturalization Service ("INS") discovered that De La Pena-Juarez was being held in a Brownsville, Texas jail on charges of aggravated assault.[1] On the same day, following an INS interview during which De La Pena-Juarez informed an INS agent that he had previously been deported, the agent placed a civil detainer on De La Pena-Juarez. De La Pena-Juarez was subsequently held in custody

---

[1] De La Pena-Juarez was convicted of aggravated assault on June 28, 1999 and placed on probation for that offense the following day. Accordingly, after June 29, 1998, De La Pena-Juarez was only being held in custody by virtue of the INS detainer.

at an INS detention center in Los Fresnos, Texas between approximately June 29 and July 14.

On July 14, 1998, the INS filed criminal charges against De La Pena-Juarez based on illegal reentry into the United States in violation of 8 U.S.C. § 1326. After he was indicted on this charge on August 4, De La Pena-Juarez filed a motion to dismiss the indictment, alleging a violation of the Speedy Trial Act. Specifically, De La Pena-Juarez argued that more than thirty days had passed between his "civil arrest" on June 29 and his indictment for illegal reentry on August 4. The district court denied the motion, basing its ruling "primarily upon the fact that this Judge, this Court, [was] satisfied that the detention of the defendant until July 14, 1998, was not predicated upon actual criminal charges being filed against [De La Pena-Juarez]." De La Pena-Juarez entered a conditional guilty plea to the illegal-reentry charge, preserving his right to appeal the court's ruling on his motion to dismiss. After his conviction and sentencing, De La Pena-Juarez filed this timely appeal.

B

Aguirre-Tibra, a citizen of Mexico, was deported from the United States in 1993 after pleading guilty to aggravated assault with a deadly weapon. Sometime thereafter, he illegally reentered the United States.

On November 16, 1997, Aguirre-Tibra was arrested for unlawfully carrying a weapon in Harris County, Texas. On December 7, during his pretrial detention, Aguirre-Tibra was interviewed by INS Agent Smith, and Aguirre-Tibra admitted that (1) he was in the United States illegally, (2) he was a Mexican national, and (3) he had a prior felony conviction. Agent Smith filed a detainer on Aguirre-Tibra that afternoon. After the interview, Agent Smith ran a computer search to locate and order Aguirre-Tibra's alien file ("A file").

On December 30, 1997, Aguirre-Tibra pleaded guilty to the state weapons charge and was

sentenced to one year imprisonment. He completed the sentence, and on May 16, 1998, Aguirre-Tibra was released into INS custody. At that time, INS agents detained him on civil deportation charges. Later that day, Agent David Jennings of the INS Investigations Branch[2] interviewed Aguirra-Tibra, who again admitted to his illegal reentry as a previously-deported felon. Agent Jennings then fingerprinted Aguirre-Tibra and prepared a notice of intent to reinstate the prior order of deportation. Aguirre-Tibra was then transferred to an INS detention center in Houston. Aguirre-Tibra's alien file was placed in a red folder and sent to the Deportations Branch. According to both parties, a red folder indicates that the Investigations Branch is investigating the detainee for possible criminal prosecution.

According to the government, once a deportable alien is placed in detention, the Investigations Branch and the Deportations Branch of the INS work independently. Here, between August 6 and September 11, agents in the Investigations Branch (1) ordered a certificate of nonexistence of record, a document that would confirm whether or not Aguirre-Tibra had applied to the Attorney General for permission to reenter the United States,[3] and (2) examined Aguirre-Tibra's fingerprints to confirm that they matched the fingerprints on the original warrant of deportation. On September 11, 1998, the Investigations Branch referred Aguirre-Tibra's case to the United States

---

[2]     Both parties state that, for the most part, the Investigations Branch functions independently of the Deportations Branch. According to the government, the Investigations Branch has no authority to prevent the Deportations Branch from proceeding with deportation of an alien. The government concedes, however, that it is "unusual for the Deportations Branch to deport an alien who is the subject of an investigation that could result in a criminal charge. But in at least one instance, the Deportations Branch deported an alien who had already been indicted but had not yet been transferred to the marshal's custody."

[3]     The INS received this document on September 15.

-4-

Attorney's Office for prosecution.[4]   On October 26, 1998, Aguirre-Tibra was indicted for illegal reentry after deport ation.  Three days later, on October 29, Aguirre-Tibra was arrested on the indictment by the United States Marshal and taken into federal criminal custody.[5]

The Deportations Branch took no action to deport Aguirre-Tibra until December 11, 1998, when it issued an order of deportation.  Agent Jennings attributed the delay in deportation to the backlog of cases in the Deportations Branch and the fact that the Investigations Branch was investigating the possibility of recommending criminal charges against Aguirre-Tibra.

On January 19, 1999, Aguirre-Tibra filed a motion to dismiss the indictment based on an alleged violation of the Speedy Trial Act.  He claimed that the speedy trial clock began to run on May 16, 1998, when he was first placed in INS custody.  The district court denied his motion.

Aguirre-Tibra was subsequently convicted of illegal reentry and sentenced to forty-five months imprisonment and three years of supervised release.  Without objection by either side, the district court also ordered at the sentencing hearing that 50% of Aguirre-Tibra's prison earnings be sent to his family to help care for his children.  Aguirre-Tibra filed this timely appeal.

II

On appeal, both De La Pena-Juarez and Aguirre-Tibra argue that the district court erred in denying their motions to dismiss under §§ 3161(b) and 3162(a)(1) of the Speedy Trial Act because

---

[4]     Agent Jennings testified that the delay in referring the case to the U.S. Attorney's Office was due largely to a backlog of cases and flurry of transfers within the Investigations Branch. He further testified that he was unable to perform a fingerprint analysis until he received the proper training in July 1998.

[5]     Agent Jennings testified that the 45-day delay between the forwarding of the file to the U.S. Attorney and the return of the indictment was due to the "overwhelming workload" at the U.S. Attorney's Office.

more than thirty days elapsed between their civil detentions and their criminal indictments. With respect to De La Pena-Juarez, the government argues that the "speedy trial time clock" did not start running until July 14, the date that the INS officially filed charges against De La Pena-Juarez, and, accordingly, his indictment was timely under the Speedy Trial Act. With regards to Aguirre-Tibra, the government argues that the time clock did not begin to run until October 29, 1998, the date on which Aguirre-Tibra was arrested and detained on a federal charge of illegal reentry after deportation. We review the district court's factual findings regarding a Speedy Trial Act motion for clear error and its legal conclusions *de novo*. *See United States v. Bailey*, 111 F.3d 1229, 1235 (5th Cir. 1997).

The Speedy Trial Act requires federal authorities to indict and try an incarcerated individual within a certain time period after his arrest. Of particular relevance to this case, § 3161(b) provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." [6] 18 U.S.C. § 3161(b). Failure to comply with the time limits set out in the Act results in dismissal of charges. *See* 18 U.S.C. § 3162(a)(1) ("If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.").

As a general rule, the provisions of the Speedy Trial Act do not apply to civil detentions. *See United States v. Hausman*, 894 F.2d 686, 688-89 (5th Cir. 1990) ("In addition, Hausman suggests

---

[6] An individual is "arrested" under the Speedy Trial Act only when he is "taken into custody after a federal arrest for the purpose of responding to a federal charge." *United States v. Johnson*, 815 F.2d 309, 312 (5th Cir. 1987).

that the perfections of § 3161(b) should have been triggered by the filing of the federal detainer against him. We have rejected this argument in both *United States v. Johnson* and in *United States v. Taylor*.") (internal citations omitted). On its face, the thirty-day requirement applies only to an indictment issued in connection with the offense for which the defendant was arrested. *See* 18 U.S.C. § 3161(b); *United States v. Cepeda-Luna*, 989 F.2d 353, 355 (9th Cir. 1993). "Offense" is defined as "any Federal criminal offense." 18 U.S.C. § 3172(2).

Several courts have applied this proposition to the immigration context, holding that the Speedy Trial Act is not implicated when a defendant is detained on civil deportation charges. *See, e.g., United States v. Grajales-Montoya*, 117 F.3d 356, 366 (8th Cir. 1997); *United States v. Cepeda-Luna*, 989 F.2d 353, 355-56 (9th Cir. 1993) ("Consistent with these cases, we hold that the Speedy Trial Act is not implicated when a defendant is detained on civil charges by the Immigration and Naturalization Service."); *United States v. Restrepo*, 59 F. Supp. 2d 133, 137 (D. Mass. 1999). Having never before addressed this precise issue in a published opinion, we now find this to be a reasonable application of the general rule. *Cf. United States v. Minister David Iredia*, No. 95-20657 (5th Cir. December 11, 1995) (unpublished) (holding that civil arrest in connection with INS's lawful function regarding deportation did not implicate Speedy Trial Act even though defendant was subsequently charged with unlawful reentry).

In *United States v. Cepeda-Luna*, the Ninth Circuit carved out an exception to this rule. the requirements of the Speedy Trial Act, the court determined, "would lose all meaning if federal criminal authorities could collude with civil or state officials to have those authorities detain a defendant pending federal charges solely for the purpose of bypassing the requirements of the Speedy Trial Act." *Cepeda-Luna*, 989 F.2d at 357. Thus, the court held that the Speedy Trial Act was

triggered by "civil detentions which are mere ruses to detain a defendant for later criminal prosecution." *id.* at 357; *see also Grajales-Montoya*, 117 F.3d at 366 (same). Under this exception, several courts have held that an INS arrest triggers the Speedy Trial Act's time clock where the administrative and criminal charges against the defendant are identical such that the detention is simply used as a "substitute for criminal arrest." *Restrepo*, 59 F. Supp. 2d at 137 ("[W]hile a civil detention by the INS alone does not necessarily trigger the Speedy Trial Act, where that period of detention is used primarily or exclusively to develop criminal charges involving the conduct on which the civil arrest was based, the time limit established by the Speedy Trial Act begins running on the date of the civil arrest."); *see also United States v. Vasquez-Escobar*, 30 F. Supp. 2d 1364, 1367 (M.D. Fla. 1998) (holding that Speedy Trial Act was triggered where INS held defendant solely for illegally reentry and then criminally charged him with same); *United States v. Okuda*, 675 F. Supp. 1552, 1554-55 (D. Haw. 1987) (holding, pre-*Cepeda Luna*, that where basis of INS arrest was same criminal charge, INS detention triggered the thirty-day speedy trial time clock).

We agree with these courts that civil detention should not be used as a delay tactic. We view the "ruse exception" as an effective way of protecting against the possibility of collusion between federal criminal authorities and civil or state officials. *Cepeda-Luna*, 989 F.2d at 356. However, we will only apply this exception where the defendant demonstrates that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution. *Cf. United States v. Johnson*, 29 F.3d 940, 945 (5th Cir. 1994) ("As noted above, the defendant has the burden of providing adequate proof to support his motion to dismiss [for a violation of the Speedy Trial Act].")

A

De La Pena-Juarez argues that the facts of this case place it squarely within the ruse exception. More specifically, he argues that on June 29, the date of the civil detainer, the INS knew that De La Pena-Juarez had illegally reentered the country. He contends that "[b]ecause Mr. De La Pena-Juarez's INS arrest and criminal prosecution were for the same offense and because his INS detention was for reasons primarily and exclusively related to his criminal case, the Speedy Trial Act began to run with his civil arrest." In effect, he contends that the INS's civil detainer was a substitute for criminal prosecution.

There is insufficient evidence in the record to support his contention that the civil arrest was a "mere ruse" to detain him for criminal charges of illegal reentry. As an initial matter, De La Pena-Juarez presents absolutely no evidence of collusion between the INS and criminal officials. Most notably, however, it is not clear to us that the administrative and criminal charges filed against De La Pena-Juarez were in fact identical. While there is no question that (1) the INS agent who interviewed De La Pena-Juarez was on notice that he had been previously deported, and (2) the INS verified De La Pena-Juarez's prior deportation between June 29 and July 14, there is no evidence that illegal reentry formed the only—or even the primary—basis for the civil detainer. At De La Pena-Juarez's rearraignment, the INS agent testified only that "on June 29th INS interviewed [De La Pena-Juarez] and they found out that he was an illegal alien. At that point an INS civil detainer was placed on him." He further testified that at the time of the civil detention, the INS did not have enough information to charge De La Pena-Juarez with illegal reentry. Nor has De La Pena-Juarez demonstrated that there was no other possible reason for his civil detention. These facts stand in stark contrast to those of several of the cases cited by De La Pena-Juarez in which it is clear that, from the date of civil detention, the INS was holding the defendant for the very same reasons that it

ultimately prosecuted him. *See, e.g., Restrepo*, 59 F. Supp. 2d at 136 (finding that administrative and criminal charges were identical where, on day of civil arrest, INS noted under defendant's fingerprint sheet that (1) he was being charged with reentry after deportation and (2) he was being "detained by INS pending prosecution/removal"); *Vasquez-Escobar*, 30 F. Supp. 2d at 1367 (finding that the government "admit[ted] that it was not holding [the defendant] to effectuate his deportation under § 241(a)(5). Instead, it held him . . . for illegally reentering the United States, specifically to provide the government the time and evidence necessary to establish his 'guilt beyond a reasonable doubt' for an identical criminal charge of illegally reentering the United States under 8 U.S.C. § 1326(a).").

Absent a showing that the INS civilly detained De La Pena-Juarez solely based upon his illegal reentry into the United States, we find that the district court did not clearly err in finding that the INS's decision to detain him was not predicated upon actual criminal charges being filed against him. *See Bailey*, 111 F.3d at 1235.

De La Pena-Juarez has not demonstrated that he was "arrested" for illegal reentry under the Speedy Trial Act on June 29. Accordingly, the speedy trial time clock began to run on July 14, and De La Pena-Juarez's indictment fell within the time period set out in § 3161(b).

B

Similarly, Aguirre-Tibra argues that the facts of his case show that his INS detention was merely an end-run around the requirements of the Speedy Trial Act. More specifically, he contends that on May 16, the day that he was taken into INS custody, the INS knew that he had been previously deported and that he had illegally reentered the country. The INS, he argues, could have either presented his case to the United States Attorney for prosecution or deported him at that time. The five-month detention before his indictment, Aguirre-Tibra contends, was for reasons "primarily

and exclusively" related to his criminal case.

While this case presents a  closer question, we again find that there is no clear evidence that Aguirre-Tibra was civilly detained primarily to hold him for future prosecution. Although it is clear that by May 16, Aguirre-Tibra had told INS agents that he had illegally reentered the United States, it is not clear that illegal reentry formed the primary basis for his civil detention.  Indeed, Aguirre-Tibra does not even allege that the INS had no other reason to detain him, and, under the facts of this case, the INS clearly could have detained him based on his convictions as an aggravated felon. *Compare Vasquez-Escobar*, 30 F. Supp. 2d at 1367 (finding that civil detention was a "ruse" where defendant was taken into INS custody solely based on illegal reentry charges and then subsequently prosecuted for same), *with Cepeda-Luna*, 989 F. 2d at 357 (finding that ruse exception did not apply where defendant was originally detained as aggravated felon and ultimately criminally charged with illegal reentry).

While Agent Jennings testified that the delay in deportation was due in part to the fact that the Investigations Branch was considering recommending filing criminal charges against Aguirre-Tibra, he also testified that the delay was due in at least equal part to the backlog of cases in the Deportations Branch.  Beyond this, there is no evidence that the Investigations Branch encouraged the Deportations Branch to delay deportation so that it could further investigate criminal reentry charges.  To the contrary, the government states—and Aguirre-Tibra does not contest—that the branches of the INS rarely work together once defendant has been detained.  Taken as a whole, we do not believe that the evidence in the record supports a finding that Aguirre-Tibra's detention was "used primarily or exclusively to develop criminal charges involving the conduct on which the civil arrest was based." *Restrepo*, 59 F. Supp. 2d at 138-38.

Finally, we agree with the district court that Aguirre-Tibra presents no evidence of collusion between the United States Attorney's Office and the INS. There is no evidence that the U.S. Attorney was even aware of Aguirre-Tibra's detention prior to September 1, 1998, let alone encouraging the INS to detain him. *See Cepeda-Luna*, 989 F.2d at 355 ("Thus, there is no evidence of collusion between federal criminal and civil authorities which would mandate the application of the provisions of the [Speedy Trial] Act to civil detentions."). The fact that federal criminal authorities might have known about Aguirre-Tibra's detention after that date does not necessarily support a conclusion that they colluded with the INS to detain Aguirre-Tibra. *See id.* at 355 ("This circuit has repeatedly declined to apply the Speedy Trial Act in situations where the defendant's detention is not pursuant to federal criminal charges, even though federal criminal authorities may be aware of and even involved with that detention."). Rather, here, Agent Jennings testified that the forty-five day delay following INS's referral of the case was due to the heavy workload at the United States Attorney's Office.

Taking all of the evidence into account, and keeping in mind the proper standard of review, we do not believe that the district court clearly erred in finding that (1) Aguirre-Tibra's detention was due, at worst, to oversight and incompetence on the part of the INS, and, therefore (2) the speedy trial clock began running on October 29, the date of Aguirre-Tibra's arrest. We, like the court in *Cepeda-Luna*, are sympathetic to the plight of defendants who are detained for long periods of time simply due to government inefficiency, s*ee Cepeda-Luna*, 989 F.2d at 358. However, absent evidence of collusion, the Speedy Trial Act is not the proper remedy for resolving a delay of this nature in the civil context. *See id.* at 358.

III

Aguirre-Tibra also argues that the district court lacked the authority to require as a condition of his sentence that fifty-percent of his prison earnings be garnished to support his children. The government contends that the garnishment was a recommendation, not a mandate, to the Bureau of Prisons ("BOP") and therefore fell within the court's authority. Since Aguirre-Tibra failed to object to the sentence as pronounced in the district court, we review his challenge for plain error only. *See United States v. Maldonado*, 42 F.3d 906, 909-12 (5th Cir. 1995).

At sentencing, the district court stated:

> Although you do not have the ability to pay a fine and I waive the fine . . . I do order that 50 percent of any of the earnings that you are able to earn in prison . . . must be sent to your family to help care for your children.

The court then ordered that Aguirre-Tibra be housed in a facility close to Houston, but then recognized that it could not "order" such a provision, but only "recommend" it. The court's written judgment explicitly states that the both the garnishment and the housing provisions of the sentence were "recommendations to the Bureau of Prisons."

As a general rule, when a written sentence is in conflict with the oral pronouncement, the oral pronouncement controls. *See Scott v. United States*, 434 F.2d 11, 20 (5th Cir. 1970). However, it is the district court's intention that ultimately determines the final judgment. *See United States v. Kindrick*, 576 F.2d 675, 677 (5th Cir. 1978). Thus, if instead of a conflict, there is merely an ambiguity between the two sentences, the entire record must be examined in order to ascertain the district court's true intent. *See Scott*, 434 F.2d at 20.

At the sentencing hearing, the judge, after ordering that fifty-percent of Aguirre-Tibra's prison earnings be sent to his family, started to order that Aguirre-Tibra be designated to a certain facility. He then corrected himself, acknowledging the court's limited ability to "order" conditions of

imprisonment. The court's written judgment recommended to the BOP that (1) half of Aguirre-Tibra's institutional earnings be garnished and forwarded to his family and (2) Aguirre-Tibra be sent to a facility as close to Houston as possible. Taken as a whole, the evidence supports the government's argument that the court intended the garnishment of funds as a recommendation rather than an order. This recommendation was not binding upon the BOP, and, accordingly, it is not an order from which Aguirre-Tibra can appeal. *See United States v. Pineyro*, 112 F.3d 43, 45 (2d Cir. 1997) (holding that "non-binding recommendation does not fit within the class of final orders appealable either under 28 U.S.C. § 1291 (final decisions of district courts) or 18 U.S.C. § 3742 (final sentencing orders)"). The sentence imposed by the district court is therefore affirmed.

IV

For the reasons set out above, we find that the district court properly denied De La Pena-Juarez's motion to dismiss his indictment, and his guilty-plea conviction based upon this indictment is AFFIRMED (Docket No. 98-41565). We also AFFIRM the district court's (1) denial of Aguirre-Tibra's motion to dismiss his indictment and (2) garnishment of Aguirre-Tibra's prison earnings (Docket No. 99-20479).