**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1836
_____

UNITED STATES OF AMERICA,
Appellant

v.

REGINALD L. HOPKINS

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 1-21-cr-00177-001
District Judge:  The Honorable Jennifer P. Wilson
_____

Argued February 7, 2024

Before: HARDIMAN, SCIRICA, and SMITH, *Circuit Judges*

(Filed:  July 9, 2024)

Carlo D. Marchioli [ARGUED]
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N. 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102
   *Counsel for Appellant*

John A. Abom [ARGUED]
Abom & Kutulakis
2 W. High Street
Carlisle, PA 17013
   *Counsel for Appellee*

———————————————

OPINION OF THE COURT
———————————————

SMITH, *Circuit Judge*.

The Government appeals the District Court's dismissal with prejudice of one of two counts set forth in an indictment. In finding, *inter alia*, that the Government colluded with state law enforcement to evade the strictures of the Speedy Trial Act ("STA" or "the Act"), the District Court invoked a so-called "ruse exception" to the STA as the basis for granting the dismissal. The exception is a judicially created carve-out to the

Act and has not been previously adopted by this Court. Nor have any of our sister courts of appeals applied a version of the ruse exception to dismiss a federal charge for violation of a time limit established by the STA. As the District Court conceived of the purported exception, a defendant must prove two elements: first, that state charges were filed for the sole or primary purpose of preparing a federal criminal prosecution; and second, that there was collusion between state and federal authorities. Because we conclude that—at least as it relates to a prosecution first initiated in a state court—the STA contains no implied ruse exception, we will reverse the order of the District Court and reinstate the dismissed count of the indictment.

## I.

### A. PROCEDURAL HISTORY

After Reginald Hopkins was arraigned in the Court of Common Pleas of Dauphin County, Pennsylvania, on, *inter alia*, a state firearms offense, and while awaiting his state preliminary hearing,[1] a federal grand jury for the Middle District of Pennsylvania returned a two-count indictment against Hopkins. The indictment, which was filed June 23, 2021, charged Hopkins with distributing cocaine base, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), and for being a felon-in-possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). Hopkins appeared before a federal magistrate judge for his arraignment

---

[1] Hopkins's state preliminary hearing was continued four times.

and entered a not guilty plea. Thereafter, the state charges were withdrawn.

Defense counsel filed numerous unopposed motions to extend the deadline for filing pretrial motions under Federal Rule of Criminal Procedure 12 and to continue jury selection and trial. Six motions to continue were filed by two different defense counsel, each of whom also sought and received leave to withdraw from the case. Before entry of an appearance by a third defense counsel, Hopkins filed a pro se motion to dismiss the indictment for violation of the STA. Because Hopkins was still represented by counsel, the District Court ordered the motion to dismiss stricken, without prejudice to refiling with counsel's assistance.

Then came a counseled motion to dismiss, arguing that Hopkins's rights had been violated under both the STA and the Sixth Amendment. The District Court scheduled a hearing on that motion for November 15, 2022. But the day of the hearing, Hopkins's attorney—his third—withdrew. That prompted another continuance. The District Court appointed counsel number four, but he was granted leave to withdraw after six days, which resulted in the appointment of yet a fifth defense counsel. The District Court conducted an evidentiary hearing on the motion to dismiss on February 2, 2023.

In a memorandum and order filed the following month, the District Court concluded that no speedy trial violation had occurred and therefore denied the motion to dismiss. Hopkins moved for reconsideration, citing new information disclosed by the Government. The District Court scheduled a second evidentiary hearing which was held on March 24, 2023. The

4

Court granted the motion to dismiss as to the felon-in-possession count only, denying the motion as to the drug distribution charge.

The Government filed this timely appeal pursuant to 18 U.S.C. § 3731. *See United States v. Sanabria*, 437 U.S. 54, 69 n.23 (1978) (acknowledging that § 3731 "authorizes appeals from any order dismissing an indictment in whole or in part"); *United States v. Davis*, 793 F.3d 712, 717 (7th Cir. 2015). Simultaneously, it sought to stay Hopkins's criminal proceeding pending the resolution of its appeal of the dismissal of the felon-in-possession count. The District Court denied the requested stay. Ten days later, at the request of the Government, the District Court dismissed the § 841(a)(1) drug distribution charge in Count I of the indictment.

## B.  BACKGROUND

Against this procedural backdrop, we turn to the substantive basis of Hopkins's motion to dismiss and the District Court's disposition thereof.

In early 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") received information that Hopkins "was potentially selling narcotics in Harrisburg" and "may [have] be[en] in possession of firearms." App. 4. Based on this information, Darrin Bates, a police officer with the city of Harrisburg who was cross designated as an ATF task force agent ("Bates" or "TFO Bates"), opened a federal investigation into Hopkins. Pursuant to that investigation, Bates procured a federal search warrant for an address associated with Hopkins. ATF agents, along with Bates and several of his colleagues

5

from the Harrisburg Police Department, executed the warrant and recovered firearms, at least one of which had been reported stolen. Hopkins was present during the search and was arrested on state charges. As set forth above, Hopkins was subsequently indicted federally, and the state charges against him were dropped.

Hopkins moved to dismiss the federal indictment. As relevant to this appeal, Hopkins invoked a so-called "ruse exception" to the STA as the primary basis for dismissal. He asserted that his rights under 18 U.S.C. §§ 3161(b) and (c)(1) had been violated because he had been federally indicted over four months after his arrest by state authorities and because he had not been brought to trial within 70 days of that state arrest.[2]

---

[2] Section 3161(b) of the Act requires that the Government file an information or indictment no more than thirty days after the defendant is either arrested or served with a summons in connection with the at-issue charges. 18 U.S.C. § 3161(b). Section 3161(c)(1) requires that the defendant's trial start no more than seventy days after the later of either the defendant's initial appearance or the date on which the information or indictment is filed and made public. 18 U.S.C. § 3161(c)(1). Section 3161(h) lists various periods of delay that are to be excluded from both clocks.

Section 3162(a)(1) provides the sanction for violations of § 3161(b)'s thirty-day clock, stating, in relevant part, that "[i]f . . . no indictment or information is filed within the time limit required by section 3161(b) . . . such charge . . . shall be dismissed or otherwise dropped."

Though he did not dispute that, ordinarily, the provisions of the STA do not apply to state arrests, Hopkins specifically argued that his "arrest on state charges brought by ATF TFO Bates, based upon a federal search warrant applied for and executed by ATF TFO Bates, began the federal Speedy Trial clock because the arrest on state charges was merely *a ruse to facilitate federal prosecution*." Dkt. No. 66 at 6 (emphasis added) (footnote omitted).[3]

The District Court held an evidentiary hearing at which Bates testified. Bates stated that his contact in the U.S. Attorney's Office, Johnny Baer ("Baer" or "AUSA Baer"), had asked him whether he "had enough to charge [Hopkins] in the state [system]. [Bates] said yes." App. 104. Bates also confirmed that Baer "told [him] to go ahead and do the state charges." App. 101. And Bates unequivocally denied having ever "discuss[ed] a charging document" with AUSA Baer. App. 102.

In a memorandum explaining its order denying the counseled motion to dismiss, the District Court concluded that it would "assume, without deciding, that the 'ruse exception'

Section 3162(a)(2) contains a dismissal sanction for violations of § 3161(c). It provides, in relevant part, that "[i]f a defendant is not brought to trial within the time limit required by section 3161(c) . . . the information or indictment shall be dismissed on motion of the defendant."

[3] Citations preceded by "Dkt." refer to entries on the District Court's docket (1:21-cr-177, M.D. Pa.).

could apply for purposes of resolving [Hopkins's] motion." App. 162-63. The District Court specifically acknowledged in the memorandum that "the Third Circuit has not yet decided whether [to adopt] the 'ruse exception[,]'" but concluded that because our Court "has considered and discussed it . . . rather than rejecting its application," we "[might] be willing to adopt it" if "the right circumstances arose." App. 162 (internal citations omitted). The Court concluded that the facts of Hopkins's case made "the argument in favor of applying the 'ruse exception' colorable," App. 165,[4] yet acknowledged that the case "present[ed] . . . a close call," App. 168.

Ultimately, the District Court denied the motion because Hopkins had failed to demonstrate that the exception's elements, as the Court understood them, had been satisfied. The Court first "f[ound] that there [was] sufficient evidence" to "conclude that state authorities intended to prosecute Hopkins at the state level[,]" including testimony which "demonstrate[d] that the state authorities were willing to pursue the state charges *despite* the pending federal indictment" and testimony showing that "Hopkins'[s] case was

---

[4] The Court noted that this was not a circumstance "in which a purely state or local investigation was later adopted by federal law enforcement officials for federal prosecution." App. 165. The Court also pointed to the testimony which indicated that when "Bates spoke with AUSA Baer over the phone[,]" "Baer asked . . . Bates whether there was enough to file state charges[,]" and "advised . . . Bates to do so." App. 166 (internal citation omitted). And the Court noted the "significant time period in which Hopkins'[s] case languished at the state court level[.]" *Id.*

8

handled normally[.]" App. 166-67 (emphasis in original). "In light of this evidence, the [C]ourt [could not] conclude that Hopkins was held in state custody for the sole or primary purpose of preparing a federal criminal prosecution." App. 167. The Court also concluded that "Hopkins [did] not ma[ke] a sufficient showing that the requisite level of collusion was present." App. 168. Instead, testimony "demonstrate[d] [no]thing more than coordination between federal and state authorities." *Id.* Finally, and separate from its analysis of the ruse exception, the District Court rejected Hopkins's § 3161(c) and Sixth Amendment arguments.

Hopkins then filed a motion for reconsideration based on newly disclosed information. That information included a bail recommendation which Bates had made to the state magisterial district justice before Hopkins had been arraigned on state charges.[5] In its entirety, the recommendation stated:

> Affiant requests high bail on defendant due to the nature of the charges and the defendant *is being federally indicted*. If convicted would be looking at a 15[-]year mandatory sentence. The

---

[5] Bates' recommendation had not been mentioned during the first hearing on Hopkins's motion to dismiss. Bates apparently "located [it] . . . 20 days after the first evidentiary hearing[,]" and it "was produced to defense counsel on . . . the same day the [District C]ourt filed the original memorandum and order denying Hopkins'[s] motion." App. 7 (internal citation omitted).

9

> defendant does have knowledge of this and does put him at a flight risk.[6]

Dkt. No. 106, at 9 (emphasis added). The District Court re-opened the record to consider the additional evidence in support of Hopkins's renewed motion to dismiss the indictment.

The District Court held a second evidentiary hearing, at which Bates again testified. Although, during the first hearing, Bates had denied having had "any communication" with "anybody" from the US Attorney's office "about indicting [Hopkins,]" App. 102, he now testified that he had spoken with the U.S. Attorney's office about a federal indictment before making the state bail recommendation. Bates specifically testified that he "wouldn't tell a judge that [Hopkins was] being federally indicted on [his] own without talking to the [Assistant] United States Attorney." App. 223-24. He also confirmed that "it was only after [he] had the conversation with the Assistant United States Attorney that [he] then related to [the state judge] . . . that [Hopkins] would be federally indicted." App. 224.

The District Court granted in part and denied in part Hopkins's motion to dismiss the indictment. The Court first addressed Hopkins's argument as to section 3161(b). The Court reiterated its awareness that "[t]he Third Circuit ha[d]

---

[6] Testimony at the subsequent evidentiary hearing demonstrated that Bates was mistaken in his belief that, at the time of the bail recommendation, Hopkins would, if convicted, face a 15-year mandatory minimum sentence.

not yet decided whether to adopt the 'ruse exception.'" App. 10. But because "[the Third Circuit had] considered and discussed it repeatedly rather than rejecting its application," the Court "believe[d] that the Third Circuit [would] likely . . . adopt [it] if the factual circumstances of a case compel[led] such a determination." App. 10-11 (internal citations omitted). The Court then went on to predict that "it is *reasonably clear* that the Third Circuit would adopt this exception under the right circumstances[.]" App. 11 (emphasis added). Because the Court "perceive[d] that the right circumstances exist[ed] here[,]" it decided to "apply the 'ruse exception' [to Hopkins's] case." *Id.* The Court conceded that "[i]t is unclear whether there are two elements that both need to be proved" for the ruse exception to apply, or "whether a defendant can succeed by proving . . . only one element." App. 12 (internal citations omitted). But it decided to "treat the 'ruse exception' as having two separate elements, both of which need to be proven in order for Hopkins to succeed." App. 13.

In highlighting the differences in testimony between the two evidentiary hearings,[7] the District Court concluded that

---

[7] In particular, the Court pointed out that "Bates' contemporaneous bail recommendation and testimony during the second hearing starkly contradicted his prior testimony[,]" App. 21, such that "[t]he court [was] unable to reconcile the conflicting testimony TFO Bates provided during the two evidentiary hearings[,]" App. 23. The contradictions, in the Court's eyes, constituted "diametrically-opposed answers" which "fatally undermin[ed] [Bates'] credibility[.]" *Id.* Since Bates' "attempt to reconcile the conflicting testimony upon questioning by the court was not convincing," *id.*, "the court

11

"the state charges were filed for the primary or sole purpose of preparing a federal criminal prosecution against Hopkins[.]" App. 24. Then, considering the evidence and testimony from both evidentiary hearings, and "having received no evidence to the contrary," the Court "f[ound] collusion between TFO Bates and AUSA Baer." App. 26. Finally, as a "result of applying the 'ruse exception' and finding a violation of § 3161(b)," the Court dismissed the firearms charge in Hopkins's indictment. App. 28.

The Court also addressed Hopkins's argument as to section 3161(c). Again applying the ruse exception, the Court concluded that the STA's seventy-day clock began to run on the day Hopkins was arraigned in state court. The Court examined various continuances at the state court level, totaling sixty-six days, and determined that they were not excludable. And the Court noted that the Government conceded that another period of twenty days was not excludable. Considering all these factors, the Court concluded that "it [was] apparent when applying the 'ruse exception' that more than seventy days elapsed between Hopkins being charged [on firearms offenses] and seen by a judicial officer in state court and his trial." App. 32. Hopkins had thus "demonstrated that § 3161(c)(1) was violated" and that "dismissal of Count 2 [was similarly] required[.]" *Id.*

---

[could] no longer rely on . . . Bates' testimony from the first hearing about the conversation with AUSA Baer or his description of his intention in filing the state charges," App. 24.

12

To determine whether to dismiss Count 2 with or without prejudice, the Court went on to balance the factors set forth in 18 U.S.C. § 3162(a)(1)-(2), including the "seriousness of the offense[,]" "facts and circumstances of the case which led to the dismissal[,]" and "the impact of a reprosecution on the administration . . . of justice." App. 32 (citing these subsections). The Court ultimately concluded that the majority of the factors weighed in favor of Hopkins and thus dismissed Count 2 of the indictment with prejudice.

## II.

The Government appeals the District Court's dismissal of Hopkins's § 922(g)(1) charge. First, it argues flatly that no ruse exception to the STA exists. Alternatively, the Government contends that even assuming such an exception exists, the District Court erred by applying it in this case. Hopkins disagrees. He argues that the ruse exception is a "necessary corollary" to the STA and that the District Court correctly applied it to Hopkins's case. Hopkins's Br. 10, 12. We agree with the Government that the STA contains no ruse

13

exception premised on a state arrest.[8] We will therefore reverse.[9]

## A.  THE STA AND THE LIMITED USE OF THE RUSE EXCEPTION

The STA serves twin purposes. It "reduc[es] crime and the danger of recidivism by requiring speedy trials[.]"[10] It also "give[s] effect" to a defendant's "[S]ixth [A]mendment right to a speedy trial." *United States v. MacDonald*, 456 U.S. 1, 7 n.7 (1982) (quoting S. Rep. No. 93-1021, at 1 (1974)).[11] To

---

[8] Given the facts of the case before us, it is unnecessary to consider whether a ruse exception exists in circumstances wherein an individual has first been subject to civil arrest by federal immigration officials. *Cf. United States v. Guevara-Umana*, 538 F.3d 139, 142 (2d Cir. 2008) ("recogniz[ing the] exception" in the "civil detention" context as "appropriate" but concluding that an application of the exception was "not necessary to decide th[e] case").

[9] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. The Government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731. Our review of the District Court's interpretation of the STA is plenary. *United States v. Dyer*, 325 F.3d 464, 467 (3d Cir. 2003). We review the District Court's findings of fact for clear error. *Id.*

[10] Public Law 93-619 (Jan. 3, 1975), 88 Stat. 2676.

[11] *See also Bloate v. United States*, 559 U.S. 196, 211 (2010) ("[T]he Act serves not only to protect defendants, but also to

14

effectuate those purposes, the STA requires that the government adhere to several time limits in connection with criminal prosecutions.

Section 3161(b) provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). "If the government fails to comply with this time limit, the [STA] requires the dismissal of charges in the complaint, with or without prejudice." *Dyer*, 325 F.3d at 467 (citing 18 U.S.C. § 3162(a)(1)).

Section 3161(c)(1) provides, in relevant part, that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from" either "the filing date (and making public) of the information or indictment," or "the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1).[12]

---

vindicate the public interest in the swift administration of justice.").

[12] Section 3161(h) sets forth several categories of delay that are to be excluded from the calculation of the thirty- and seventy-day time frames. These include—as relevant here—when a delay results from a continuance granted upon a judge's finding "that the ends of justice served by taking such action

15

Ordinarily, the time limits of the STA have not been triggered by an event other than the commencement of a federal prosecution. However, beginning with the Ninth Circuit's decision in *United States v. Cepeda-Luna*, 989 F.2d 353 (9th Cir. 1993), some courts have recognized that the STA's time limits can be triggered by civil detention or a state arrest under a "ruse" exception to the STA, *id.* at 357. And different courts have articulated elements of a so-called ruse exception with slight variations. Courts that have recognized a ruse exception have generally understood it to require collusion between federal law enforcement authorities and state or civil officials for the sole or primary purpose of detaining a defendant for later federal criminal prosecution.[13] Yet no such exception is found anywhere in the text of the Act.

Since *Cepeda-Luna*, courts of appeals which have considered the exception have usually done so in the immigration context, i.e., where an individual has first been subject to civil arrest by federal immigration officials and is

outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

[13] *See, e.g.*, *United States v. Pasillas-Castanon*, 525 F.3d 994, 997 (10th Cir. 2008) ("While civil arrests and detentions do not ordinarily trigger the Speedy Trial Act, they may activate it when law enforcement authorities collude with state or civil officials to detain a defendant as a mere ruse for later prosecution.") (internal citation omitted).

later criminally charged.[14] Some, though, have done so in the state context, i.e., where an individual has first been subject to

---

[14] *See United States v. Saucedo*, 956 F.3d 549, 553 (8th Cir. 2020) ("[W]e decline to reach" whether we "recognize[] the ruse exception" because, even "assuming, without deciding, that there is a ruse exception to the [STA], it would not apply in this case."); *Guevara-Umana*, 538 F.3d at 142 ("recogniz[ing the] exception" in the "civil detention" context as "appropriate" but concluding that an application of the exception was "not necessary to decide th[e] case"); *United States v. Rodriguez-Amaya*, 521 F.3d 437, 442 (4th Cir. 2008) (holding that the STA "includes a ruse exception in the context of civil detention," but concluding "that the . . . exception [did] not apply" to the "case at bar"); *Pasillas-Castanon*, 525 F.3d at 997-98 (noting that "civil arrests and detentions . . . may activate [the STA] when law enforcement authorities collude with state or civil officials to detain a defendant as a mere ruse for later prosecution[,]" agreeing that the STA "cannot be evaded through sham civil proceedings[,]" but warning that "[t]he ruse exception is not easily triggered" and concluding that the exception did not apply here); *United States v. Garcia-Echaverria*, 374 F.3d 440, 451-52, 452 (6th Cir. 2004) ("assum[ing] that [the ruse exception] applies to persons held in detention and awaiting removal, when there is evidence of collusion between deportation and prosecution authorities[,]" "[a]ssuming without deciding that [the underlying] events demonstrate[d] collusion," but affirming the denial of defendant's motion to dismiss because he failed to show that "his detention . . . was a criminal arrest"); *United States v. Tejada*, 255 F.3d 1, 4 (1st Cir. 2001) (addressing the immigration context, acknowledging in passing that the ruse

17

exception may be applicable in certain circumstances, but finding "no evidence" of detention "for any reason other than routine inquiry into . . . suspicious immigration status"); *United States v. De La Pena-Juarez*, 214 F.3d 594, 598 (5th Cir. 2000) ("agree[ing] . . . that civil detention should not be used as a delay tactic . . . view[ing] the 'ruse exception' as an effective way of protecting against the possibility of collusion between federal criminal authorities and civil or state officials," emphasizing that it would "only apply this exception where the defendant demonstrates that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution[,]" but concluding that "[t]here is insufficient evidence in the record to" apply the exception to this case) (internal citations omitted); *United States v. Noel*, 231 F.3d 833, 836-37 (11th Cir. 2000) (though the STA may be triggered "when detentions are used by the government, not to effectuate deportation, but rather as 'mere ruses to detain a defendant for later criminal prosecution[,]'" defendant "presented no evidence that his detention was a ruse") (internal citations omitted); *United States v. Grajales-Montoya*, 117 F.3d 356, 366, 367 (8th Cir. 1997) (seeming to acknowledge the existence of the ruse exception, but concluding that the initial detention here "was for reasons other than" preparing a federal prosecution, that there was no "evidence that [detention was] a ruse to evade the" STA, and that the "requisite collusion" was not present).

18

criminal arrest by state officials and is later federally charged.[15] The D.C. Circuit appears to have rejected the exception outright.[16]

---

[15] *See United States v. Mearis*, 36 F.4th 649, 653 (5th Cir. 2022) (recognizing the exception and defining the appropriate standard, and holding that the Court "appl[ies] the same standard to a state criminal arrest"); *United States v. Faison*, 555 F. App'x 60, 63 (2d Cir. 2014) ("collusion between state and federal authorities can create [such] an exception"); *United States v. Woolfolk*, 399 F.3d 590, 595-96 (4th Cir. 2005) (in the state context, and only "in limited circumstances," "an individual being held by state authorities" could be considered "under 'federal arrest' or in 'federal custody'" if "the Government has knowledge that an individual is held by state authorities only to answer to federal charges"; remanding for consideration by the District Court); *United States v. Benitez*, 34 F.3d 1489, 1494-95 (9th Cir. 1994) (Though STA "time periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act[,]" and though the case presented a "very close" call, the Court did not "conclude that the district court's finding that the state prosecution was brought in good faith was clearly erroneous.") (internal citations omitted).

At least one court, albeit not precedentially, has apparently limited the ruse exception to the immigration context. *See United States v. Alvarado-Linares*, 698 F. App'x 969, 974 (11th Cir. 2017) ("limit[ing]" the ruse exception "to a situation in which *federal* immigration officials detain an immigrant ostensibly to remove him from the country, while in reality they actually hold him solely for the purpose of bringing

19

No court of appeals has ever applied the ruse exception to conclude that an STA violation had occurred and that dismissal of federal charges was therefore warranted.

Since our 2003 decision in *Dyer*, this Court has left open the question of whether to adopt a ruse exception to the STA. In *Dyer*, the defendant was detained by agents of the Immigration and Naturalization Service ("INS") for illegally reentering the United States after he was deported. 325 F.3d at 465. There, the Special Agent handling the case contacted the United States Attorney's Office, and Dyer was criminally indicted approximately forty days following his initial detention by INS. *Id.* Dyer moved to dismiss, alleging a violation of the STA and invoking a ruse exception. *Id.* at 465-66. The District Court denied the motion and Dyer entered a conditional guilty plea. *Id.* at 466. On appeal, Dyer argued that "the [STA]'s time limit began to run when the INS took him into custody under the 'ruse exception' recognized by some

*federal* criminal charges" and emphasizing that "[j]oint state and federal investigations are the norm" and that "state authorities . . . h[o]ld sovereign discretion") (emphasis in original). Another has assumed without deciding that the exception could apply to state arrests. *See United States v. Asfour*, 717 F. App'x 822, 825-26 (10th Cir. 2017) (unpublished).

[16] *United States v. Knight*, 824 F.3d 1105, 1109-10 (D.C. Cir. 2016) (Kavanaugh, J.) (noting that "the Court ha[d] previously declined to create such an exception to the" STA) (citing *United States v. Mills*, 964 F.2d 1186, 1188, 1192 (D.C. Cir. 1992) (en banc)).

[courts]." *Id.* at 468 (internal citations omitted). Yet we declined "to decide whether to recognize the ruse exception." *Id.* Further, "[e]ven if we [had] conclude[d] that the exception [was] a valid one," we determined that "Dyer ha[d] not shown that he would be entitled to invoke it[.]" *Id.* (internal citation omitted). Since *Dyer*, we have treated attempts to invoke the ruse exception in the same manner—and, even then, in only non-precedential decisions.[17]

## B. WE REJECT A RUSE EXCEPTION PREMISED ON A STATE ARREST

The Government argues that there is no ruse exception to the STA because such an exception "conflicts with the unambiguous text of the [STA]" and that an examination of the "text should end the inquiry." Govt Br. 18, 19 (internal citation omitted). The Government also asserts that "[c]ase law [similarly] does not support" an exception because statements

---

[17] *See United States v. Costello*, 720 F. App'x 120, 123 (3d Cir. 2018) ("We again need not decide whether there exists a 'ruse' exception to the . . . [STA] . . . because there simply is no evidence of collusion . . . or . . . det[ention] . . . for the purpose of preparing a federal prosecution."); *United States v. Crews*, 494 F. App'x 240, 243 (3d Cir. 2012) (noting the recognition of the ruse exception among other courts of appeals, but deciding "not [to] consider [it] here since there is no evidence to support the application of such an exception") (internal citations omitted); *United States v. Brown*, 445 F. App'x 474, 479-80 (3d Cir. 2011) ("Our Circuit has yet to recognize [the] 'ruse exception' . . . [but] even if such an exception exists, we will [not] apply it" here.).

by those "circuits [which] have [concluded] that the ruse exception exists . . . all amount to dicta." *Id.* at 23, 24. Hopkins counters that the ruse exception is a "necessary corollary" to the Act. Hopkins's Br. 10, 12. We agree with the Government and conclude that a ruse exception is inconsistent with the text of the STA and that there are sound policy rationales for declining to adopt a ruse exception.

> ### i. *The exception is inconsistent with the text of the STA.*

When "interpreting a statute[,] a court should always turn first to one, cardinal canon before all others[:] . . . that courts must presume that a legislature says in a statute what it means[,] and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal citations omitted). And "[w]hen the words of a statute are unambiguous . . . this first canon is also the last: judicial inquiry is complete." *Id.* at 254 (internal citations and quotation marks omitted).

The STA contains no explicit provision establishing a ruse exception. As a starting point, the STA defines the term "offense" as "a[] *Federal* criminal offense." 18 U.S.C. § 3172(2) (emphasis added). Such offenses include only those which "violat[e] . . . any Act of Congress and [which are] triable by any court established by Act of Congress." *Id.* State courts, by definition, do not fall into that category. Further, it is only after an individual is "arrested or served with a summons in connection with *such charges*"—i.e., federal charges—that the STA's protections come into play. *Id.* § 3161(b) (emphasis added). The statute requires that these

22

charges be contained within one of two documents: either an "information" or "indictment." *Id.* § 3161(b), (c). These terms refer to charging documents that must be filed in the federal criminal system in order for the government to proceed to trial on felony charges. Fed. R. Crim. Proc. 7.[18] Finally, the STA defines "judge" and "judicial officer" as "any United States magistrate" or "*Federal* district judge[.]" *Id.* § 3172(1) (emphasis added). Plainly, state judicial officers do not fall into this category.

Even courts of appeals which have read a ruse exception into the STA concede that the STA's plain language does not expressly apply to civil or state detentions. *See Cepeda-Luna*, 989 F.2d at 355 ("The language of the [STA] compels the conclusion that its provisions do not apply to civil detentions[,]" and offense means "any Federal criminal offense.") (cleaned up); *Woolfolk*, 399 F.3d at 595 ("[F]or the [STA] to apply, the defendant must be under federal arrest or be in federal custody.") (cleaned up). Those in search of statutory text within the STA that might support even the

---

[18] While a federal felony may initially be charged by complaint, Fed. R. Crim. Proc. 3, an indictment or information must be filed within 30 days of the arrest on such complaint in order for the felony charges to proceed, even when a preliminary hearing is held. 18 U.S.C. § 3161(b); Fed. R. Crim. Proc. 5.1 and 7. States, by contrast, often charge and proceed on felony offenses only by filing a criminal complaint and proceeding to a preliminary hearing. *See, e.g.*, Pennsylvania's Rule of Criminal Procedure 503; 234 Pa. Code § 503 (2001).

implication of a ruse exception inevitably come up empty-handed.[19]

Congress knows how to create exceptions within statutes, and routinely does so. *See, e.g.*, 18 U.S.C. § 3582(c) (providing that a "court may not modify a term of imprisonment once it has been imposed" unless one of several exceptions applies); 52 U.S.C. § 20507(b)(2) (providing that a state may not remove a voter from its registration list for failure to vote unless specified exceptions apply); 12 U.S.C. § 5552(a)(1), (2) (delegating to state attorneys general the authority to bring federal civil enforcement actions, but generally excepting actions against certain entities from such authority unless certain conditions are met). But it did not do so when it enacted the STA, nor at any time since.

It is not the role of the courts to make policy choices which are traditionally within the realm of legislative decision-making. *See, e.g.*, *Egbert v. Boule*, 142 S. Ct. 1793, 1802-03 (2022) ("evaluat[ing] a range of policy considerations" is truly a "legislative endeavor" and an "unenviable task[,]" "Congress is far more competent than the Judiciary to weigh such policy considerations," and "the Judiciary's authority to do so at all is, at best, uncertain") (internal citations omitted) (cleaned up). Courts which have recognized a ruse exception have, in essence, implied substantive rights from a statutory text that is silent on the subject. The Supreme Court has, in recent years,

---

[19] *See also Mills*, 964 F.2d at 1189 ("Under the most natural reading . . . an arrest starts the [STA's] clock only if it is in connection with *federal* charges.") (emphasis in original) (cleaned up).

24

cautioned against such judicial overreach and emphasized the importance of respect for the separation of powers. Consider, for example, the Supreme Court's unwillingness to, on Congress's behalf, expand liability of both law enforcement officers and those who work in prisons. *See, e.g.*, *id.* at 1802 ("Now long past the heady days in which [courts] assumed common-law powers to create causes of action . . . we have come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power"; "creating a cause of action is a legislative endeavor.") (internal citations omitted) (cleaned up); *id.* at 1809 (Gorsuch, J., concurring in the judgment) ("Our Constitution's separation of powers prohibits federal courts from assuming legislative authority."); *see also Ziglar v. Abbasi*, 582 U.S. 120, 133, 135 (2017) ("It is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action" because creating a new cause of action "is . . . a 'disfavored' judicial activity.") (internal citation omitted). In our view, creating exceptions to a statutory scheme is similarly "a legislative endeavor." *Egbert*, 142 S. Ct. at 1802. A judge's role is to apply statutes and to interpret them. We do not enact them, nor do we amend them. Congress could have included a ruse exception in the STA but did not do so. Because it is not our role to search for ways to ostensibly improve an Act of Congress, we decline to engraft a ruse exception onto the plain text of the STA.

We further agree with the Government's assertion that statements by those "circuits [which] have [concluded] that the ruse exception exists . . . all amount to dicta." Govt Br. 24. As the Government persuasively explains, "[t]he [D]istrict [C]ourt

25

did not identify . . . a precedential appellate decision approving the dismissal of charges based on the exception." *Id.* Nor have we been able to do so. Hopkins's counsel conceded as much at oral argument. *See* ECF No. 36 at 17 (Though various "circuits have discussed it[,]" none have "applied it" and it has "never been used . . . to actually grant dismissal of charges."). So we are not persuaded by the out-of-circuit authority on which Hopkins relies in support of his contention that a ruse exception is "a necessary corollary" to the Act. Hopkins's Br. 12.[20]

### ii. Policy rationales for declining to adopt a ruse exception.

There are also sound policy reasons supporting our refusal to recognize a ruse exception. First, doing so would be inconsistent with principles of federalism and dual sovereignty. Recognizing a ruse exception risks binding the federal government to the actions taken by state authorities in criminal investigations and prosecutions. As the Government persuasively argues, "*Cepeda-Luna* . . . did not grapple with significant federalism concerns created by the ruse exception when state officials are involved." Govt Br. 27. States "are

---

[20] The Government also notes that Hopkins "does [not] identify any support for [a ruse] exception in the Act's legislative history." Reply Br. 3. *See also* Govt Br. 26 n.6. Whether or not one agrees that such a cross-check is useful, the legislative history of the STA is devoid of references to support the implication of a ruse exception. *See* A. Partridge, *Legislative History of Title I of the Speedy Trial Act of 1974* (Fed. Judicial Center 1980).

independent actors[,] . . . do not answer to the federal government in their enforcement of state criminal law[, a]nd . . . have their own procedures to protect defendants from unlawful or overlong state incarceration." *Id.* (internal citation omitted). A ruse exception "undermines state sovereignty" and would "invite[] burdensome federal discovery into the minds of state investigators and prosecutors[.]" *Id.* at 29. *See also* Reply Br. 3-4.

As the Supreme Court has emphasized, "an arrest or indictment by one sovereign [does] not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign." *MacDonald*, 456 U.S. at 10 n.11. Indeed, it is precisely because "the states and the federal government are distinct sovereigns . . . [that] the speedy trial protections of the [STA] apply only to arrests made for federal charges." *United States v. Clark*, 754 F.3d 401, 405 (7th Cir. 2014). Accordingly, courts have relied on similar reasoning to reject the argument that the Sixth Amendment speedy trial right attaches at the time of an earlier state charge. *See, e.g.*, *United States v. Lara*, 970 F.3d 68, 81-82 (1st Cir. 2020).[21]

Second, recognizing a ruse exception premised on a state arrest would severely hinder prosecutorial discretion. The Government argues that "[t]he exception also presents negative

---

[21] *See also United States v. Rose*, 365 F. App'x 384, 389 (3d Cir. 2010) (unpublished) ("The state arrest and state prosecution do not control the speedy trial analysis because the state and federal governments are separate sovereign entities, and the actions of one cannot typically bind the other.") (citing *MacDonald*, 456 U.S. at 10 n.11).

incentives for prosecutors, potentially inducing state prosecutors to continue to press state charges even after federal charges are brought," or alternatively "to shield the likelihood of federal charges from state courts making bail determinations even though that likelihood would undoubtedly provide motivation for a defendant to abscond." Govt Br. 27. And the Government warns of an additional incentive that could disadvantage both the prosecution and the accused: "federal prosecutors may be encouraged to hastily file federal charges after a state arrest, short-circuiting needed additional investigation." *Id.* We do not take that point lightly. As one District Judge observed in rejecting a defendant's assertion that the STA clock was triggered by his state arrest, "[i]f the Speedy Trial Act 'clock' were to start ticking at the time of the initial state arrest," federal authorities "would be forced to indict within thirty days . . . in order to preclude the possibility of a dismissal with prejudice . . . [and would be] compelled to arraign and try the defendant within seventy days of [the] indictment." *United States v. Ferrs*, 503 F. Supp. 187, 189 (E.D. Pa. 1980) (internal citations omitted), *aff'd*, 676 F.2d 688 (3d Cir. 1982). Thus, federal authorities would be "forced to try the defendant even though [they] initially preferred to wait for the state to prosecute." *Id.*; *see also United States v. Mejias*, 417 F. Supp. 585, 591 (S.D.N.Y. 1976), *aff'd*, 552 F.2d 435 (2d Cir. 1977), *cert denied sub nom. Padilla-Martinez v. United States*, 434 U.S. 847 (1977) (Triggering the STA's protections as of the date of the state indictment would "require that the [federal] government rush headlong into a . . . prosecution whenever a defendant had been arrested on state charges as the result of federal participation in an ongoing investigation.").

Finally, the Government warns that "[t]he exception . . . penalizes much-needed and expected coordination between state and federal law enforcement." Govt Br. 26 (internal citation omitted). *See also* Reply Br. 3 ("Hopkins does not . . . address countervailing policy considerations [like] the ruse exception's effect of disincentivizing essential coordination between state and federal law enforcement[.]"). We agree. Such coordination—often achieved using joint task forces—can be a valuable way to "avoid duplication of effort and resources." *Mearis*, 36 F.4th at 654.[22] The work of just such a task force is at the heart of the instant appeal. Indeed, both counsel acknowledged at oral argument the importance of such coordination. *See* ECF No. 36 at 8 (counsel for the Government) ("Even just the idea that the exception might exist can chill desired coordination between federal and state actors."); *id.* at 26 (Hopkins's counsel) (Federal and state authorities "should work together and cooperate and coordinate"). Taken together, the aforementioned policy "considerations dictate . . . that should a ruse exception exist, it should be a creation of Congress." Govt Br. 29. As we have emphasized, "judge-made equitable rules cannot claim supremacy over statutory text." *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 723 (3d Cir. 2022).

---

[22] *See also Bartkus v. Illinois*, 359 U.S. 121, 123 (1959) (federal-state "cooperation . . . is the conventional practice . . . throughout the country"); *Alvarado-Linares*, 698 F. App'x at 974 ("[j]oint state and federal investigations are the norm, and extensive discussion back and forth between state and federal authorities is not uncommon").

Hopkins claims that a ruse exception is "a necessary corollary" to the STA. Hopkins's Br. 10, 12. If that were so, how could Congress have failed to notice? As there is no textual support in the STA for recognizing a ruse exception, and given the strong policy reasons for rejecting such an exception, we decline to recognize a ruse exception premised on a state arrest.

## III.

We need not reach whether TFO Bates and AUSA Baer colluded to evade the limitations of the STA. We acknowledge, as the *Cepeda-Luna* Court did, that substantial unfairness may potentially result if state and federal authorities collude to detain individuals in the state system for the sole purpose of preparing a federal prosecution. Nothing in this opinion should be read as sanctioning such collusion or delay. In fact, we acknowledge—as did then-Judge Kavanaugh—that an alternative remedy under the Due Process Clause of the Fifth Amendment may be available. *See Knight*, 824 F.3d at 1110. Counsel for the Government agreed at oral argument that such a remedy might be appropriate. And jurisprudence supports such a conclusion. *See Mills*, 964 F.2d at 1192 ("If a defendant showed that the U.S. Attorney deliberately arrested him on D.C. charges and secured a Superior Court indictment in order to gain time to gather additional evidence for a federal prosecution, he might have a valid due process claim for pre-indictment delay"). Though we do not have occasion here to set forth the parameters of such a remedy, we leave further judicial consideration of one to an appropriate, future case.

## CONCLUSION

30

For the foregoing reasons, we will reverse the District Court's Order and remand for further proceedings consistent with this Opinion.